**McNEILL et al. v. LILLY.**

No. 6482.

United States Court of Appeals for the District of Columbia.

Argued Nov. 8, 1935.

Decided Jan. 20, 1936.

Before MARTIN, Chief Justice, and ROBB, VAN ORSDEL, GRONER, and STEPHENS, Associate Justices.

Herbert S. Ward, Robert H. McNeill, and George H. McNeill, all of Washington, D. C., for appellants.

Bion B. Libby, of Washington, D. C., for appellee.

VAN ORSDEL, Associate Justice.

Suit was brought in the Supreme Court of the District of Columbia by appellee, plaintiff below, on an unindorsed promissory note for $2,000, given by defendants to the plaintiff, dated October 1, 1930. At the conclusion of the evidence, the court, on motion of counsel for the plaintiff, directed the jury to return a verdict in favor of the plaintiff. From the judgment thereon defendants appealed.

It appears that this note was the last one of a series of renewal notes growing out of an original transaction between defendants and one Smith. Smith had secured a contract for the purchase of a large tract of timber lands in West Virginia. In consideration of assigning this contract as security, defendant R. H. McNeill agreed to execute and deliver to Smith two promissory notes for $3,000 each, payable to his own order. McNeill then indorsed the notes and delivered them to Smith, who agreed to pay them at maturity, together with an attorney's fee, to McNeill of $2,500. The proceeds from the sale of these notes, less an agreed discount of 10 per cent., were to be paid by Smith to McNeill to insure their application to the payment of the first installment on the purchase price of the timber lands.

Smith took the notes to West Virginia and offered to sell them to plaintiff Lilly for $4,500. Lilly, not being in position to purchase the notes, introduced Smith to one Stroman. Stroman stated that before purchasing the notes he would have to go to Washington and inquire into the financial standing of McNeill. Smith agreed to pay Stroman's expenses to Washington. Stroman came to Washington, and, after making some investigation, stated that he would only purchase the notes upon condition that Mrs. Cora B. McNeill, wife of R. H. McNeill, would indorse the notes. Mrs. McNeill indorsed the notes, and Stroman purchased them for $4,500, less his expenses of $75 to Washington.

The record discloses, from copies of checks appearing therein, that Stroman paid Smith a total sum of $4,475. Smith

testified: "I paid over to Mr. McNeill the amount that we agreed upon. I don't believe the total amount I paid him was as much as he expected, but he did agree to accept what I paid him and gave me a release." McNeill testified that he received from Smith the proceeds from the sale of the notes, which he thought was $2,925. He further testified: "I gave Mr. Smith credit on the timber lands for an amount equal to $4,500, which he received from Mr. Stroman. I am accepting responsibility for that amount." He also testified that when Mrs. McNeill indorsed the notes, "I said to Stroman that I authorized Mr. Smith to sell the notes at a discount of 10%. As Mrs. McNeill was on the notes, I wanted the proceeds paid directly to me and I would disburse the proceeds and protect Mr. Smith's interest and my own, I then delivered the notes to Mr. Stroman."

When Smith failed to carry out the balance of his agreement with McNeill, McNeill, under the assignment, took over the contract for the purchase of the timber lands. Later he succeeded in organizing a company which took over the contract, as McNeill stated in his testimony, with a profit to him of between twelve and fourteen thousand dollars.

Stroman took the notes to the Kanawha Valley Bank, of Charleston, W. Va., to negotiate them. The bank agreed to take the notes at a discount of 6 per cent., if Stroman would secure plaintiff Lilly as an indorser thereon. This he did, and the title to the notes passed to the Kanawha Valley Bank.

The Kanawha Bank assigned the notes to the Montgomery National Bank, of Montgomery, W. Va.; and then began a long series of attempts to collect these notes, which resulted in curtailments and renewals extending over a period of years. The Montgomery Bank finally refused to handle the matter longer, and called upon the Kanawha Bank to make good its agreement and take back the notes. This was done.

Finally, on July 1, 1930, an unindorsed note for $2,000 was executed by defendants to the Kanawha Valley Bank for the balance remaining due and unpaid. Later the bank insisted that plaintiff Lilly should take up appellant's note, which he did, by giving his own note for an amount sufficient to pay appellant's note and other personal indebtedness which he then owed the Kanawha Bank.

Under the arrangement between Lilly and the bank, appellants' note was turned over to Lilly for collection. Lilly opened negotiation with McNeill for the payment of this note. Payment was delayed from time to time and finally the delay resulted in the McNeills executing the unindorsed note in this suit for $2,000, payable to Lilly.

The declaration is on this note. Defendants in their joint and several pleas allege that the note sued upon represents an alleged balance of the two original notes of $3,000 each; that when the original notes were executed, the proceeds thereof in full were to be paid and delivered to the defendants, but that the proceeds were not so delivered but only a portion thereof; that the sum of $1,650 was wrongfully retained and never paid to the defendants or either of them; that all the facts with respect to the withholding and retention of the moneys were communicated to and made known to the plaintiff, "who had at all times been the agent and attorney, and partner and a participant in said original transaction"; that from the date of the original transaction interest had been exacted by plaintiff and those preceding him holding the two original $3,000 notes and the renewals thereof; that in the transaction respecting the payment and renewals of said notes, excessive interest had been exacted in an amount in excess of $600, as well as the amount of $1,650, unlawfully alleged to have been withheld; that at the time of the execution of the note in suit, plaintiff was fully informed of all the transactions in respect of the execution of the $3,000 notes, the retention of $1,650 from the proceeds thereof, and the payments and renewals thereon, and had "a full understanding and knowledge of the wrongful and fraudulent transactions herein referred to, and that the defendants had a good and complete defense thereto."

For further defense, defendants charged plaintiff with notice that the note in suit was not a valid obligation; "that the same had been fully paid, and that an amount in excess of its face value, equal to at least $600, on account of excess interest, usury and illegal bonus, had been wrongfully charged and collected from these defendants, and that the note itself

622

represented no consideration from the plaintiff, or anyone else, to the defendants, and defendants say that said note was not delivered, as alleged by the plaintiff, to him for value before maturity, nor has the plaintiff paid value therefor, without notice of the defects and infirmities in said note herein alleged to exist, but that on the other hand, the plaintiff took and holds the same subject to the infirmities aforesaid, and with knowledge that said note was executed without consideration and is not due by these defendants, or either of them, and that the same was executed subject to the right of these defendants to claim and assert the equities herein set out."

█ It is contended by defendants that the note sued upon was without consideration, for the reason that the note dated July 1, 1930, for $2,000, held by the Kanawha Valley Bank, was a valid and subsisting obligation, which had not been cancelled and returned to the defendants, and upon which defendants might still be held liable to the bank. It is insisted that Lilly stands in the light of a mere volunteer, and is not in position to assert any valid claim on the note in suit.

It is true that Lilly was no longer obligated as an indorser upon the McNeill original notes, or the subsequent notes given in curtailment thereof to the bank, and was in no way obligated as indorser, or otherwise, to pay the $2,000 note held by the bank. The McNeills might well have said, when Lilly proposed the giving of a new note direct to him for $2,000, that they stood obligated to the Kanawha Bank and that their settlement would be made on the basis of that note.

Lilly at that time had given his note to the Kanawha Bank covering, among other obligations, the note of July 1st against the McNeills. This, he states, he felt morally bound to do, and thought at the time he had indorsed all the notes taken from defendants by the Kanawha Bank, since he had been an indorser in the earlier note transactions between the McNeills and the bank. He might then have taken the $2,000 note from the bank, indorsed to him, and sued upon that note, but this was not done. The cashier of the bank testified in regard to this transaction "that the Kanawha Valley Bank surrendered its possession of that note, and turned it over to General Lilly as our agent to collect it."

Lilly attempted to secure payment of that note, and on failing to do so, finally proposed to the McNeills the giving of a new note (the note sued upon) to Lilly in consideration, it may be implied, for the return or cancellation of the other note, and an extension of six months for the payment thereof. It may be here suggested that no contention was then made of lack of consideration, due either to usury or the failure of Smith to return $1,650 of the proceeds of the sale of the notes to McNeill. This failure it may be suggested was later compromised by McNeill, as will hereafter appear, by his giving Smith full credit for the $4,500 derived from the sale of the notes when the timber land contract was forfeited and turned over to McNeill.

█ Lilly, as the agent and attorney of the bank, held the note for collection. A note may be paid and the indebtedness evidenced thereby discharged, either by payment, or by the giving and acceptance of a new note. The giving of the note to Lilly, the agent of the bank, and the acceptance by the bank of its agent Lilly's note, in payment and discharge of the McNeill note, amounts to a complete estoppel of any further claim of the bank against the McNeills.

█ The plea of usury cannot be sustained upon any theory. What occurred was this: McNeill made the two original $3,000 notes payable to himself, indorsed them, and turned them over to Smith to sell. Smith negotiated with Stroman for the sale of the notes at a 25 per cent. discount. Stroman came to Washington and refused to purchase the notes until they had been indorsed by Mrs. McNeill. When she indorsed them, McNeill turned the notes over, not to Smith, but to Stroman, with the understanding that the proceeds of the sale were to be turned over to McNeill. The proceeds of the sale of the notes was to be used to make a payment on the timber land contract. McNeill had already taken an assignment of the timber land contract as security for the full payment of the notes, with interest, and the further agreement on the part of Smith to pay the sum of $2,500 as attorney's fee. In the event of the failure of Smith to carry out his part of the

contract, the timber land contract was to be forfeited to McNeill.

That this was the clear understanding of McNeill is verified in his testimony, as follows: "I had been protected by the assignment he (Smith) turned over, and by $1,000 out of the $2,500 which he applied on the timber land contract. That is the only money which has ever been received by me by the transaction. I am not sure I received as much as $2,975. I gave Mr. Smith credit on the timber lands for an amount equal to $4,-500, which he received from Mr. Stroman. I am accepting responsibility for that amount. With respect to the timber lands, Mr. Smith was to have 90 days in which to finance the deal. If he succeeded he was to pay these notes and I was to be paid a fee of $2,500 for aiding him and legal services. He fell down on the matter, and at the end of 90 days he agreed that the contract was forfeited."

There is no denial by McNeill that he had knowledge of the fact that Smith in his transaction with Stroman discounted the notes in the amount of $1,500. This constituted neither a bonus nor a commission paid by McNeill in connection with the negotiation of the notes made by him payable to himself. Stroman, testifying as to the original purchase of the notes in Washington, said: "Mr. McNeill and I never discussed how the money was to be disbursed. There was no controversy between us about the amount of the discount which would be required."

■ Stroman, on the other hand, assigned the notes, with nothing on their face to denote usury, to the Kanawha Valley Bank, an innocent purchaser, in due course, and without knowledge of any of the transactions had between the McNeills, Smith, and Stroman. Not until then did General Lilly become connected with the transaction as an indorser of the notes. Later, without any question being raised as to usury, the notes were curtailed and new notes given from time to time by the McNeills. This of itself, had usury existed in the original transaction, after the notes had passed into the hands of a bona fide holder for value, would constitute an estoppel against any claim for usury. "If an innocent third party, without knowledge of the fact that an obligation contains usury, becomes the holder and purchaser of it for a valuable consideration, and thereafter the obligor dis-

charges it, by executing a new note payable to the innocent holder for the old note, a new debt is thereby created, and the consideration for the new note will be deemed a valid one, although the usury from the old debt was carried over into the new without the knowledge of the payee, and when the obligor pays the new note, he will not have any cause of action against the payee of the new note for the usury which was brought into it from the old note, nor can he resist the payment of the new note, by a plea of usury." Taulbee v. Hargis, 173 Ky. 433, 443, 191 S.W. 320, 325, Ann.Cas.1918A, 762.

■ That certain of the renewal notes bore interest at the rate of 8 per cent. appears from the record. These, however, were West Virginia contracts, not District of Columbia contracts, and there is nothing in the record to show that 8 per cent. was usurious in the state of West Virginia, where the notes were made and where they were payable. In the absence of any contention on this matter, it must be assumed that the contracts were lawful contracts, and lawfully executed. In respect of the interest charged on one of the renewal notes, McNeill, seeming to recognize 8 per cent. as a legal rate in West Virginia, in a letter to Lilly, dated as late as June 11, 1929, relative to the giving of a renewal note, said: "Under all the circumstances, I am willing to meet the bank's views about the interest rate on this note so that it will bear 8%. This will make the bank satisfied, and while it will cost us more the time is worth it."

The note here sued upon bears a lawful rate of interest in the District of Columbia where suit was brought, and there is nothing to indicate that it is in any respect tainted with usury. In the giving of the original notes and the numerous renewal notes, no question of usury seems to have been suggested until the present suit was brought. It is sought now to attach to the note in suit liability for usury, due to the discount made by Smith in the sale of the notes to Stroman, on the theory that Lilly had full knowledge of that transaction. Assuming that he had, Lilly was in no respect a party to that transaction, or chargeable with the actions of any of the parties connected therewith. When McNeill executed a renewal note to the bank, the

innocent holder in due course, this constituted a valid consideration, and McNeill waived his right to further set up the claim of usury. The rule is well stated in 39 Cyc. 1006, as follows: "When the debtor under a usurious obligation, which has come into the hands of an innocent purchaser for value, executes a new note to such third person, he will be deemed to have waived his right to set up usury, and the new note will be deemed to be upon a valid consideration."

It follows that when Lilly, on the assumption that he was obligated as indorser, paid the note to the Kanawha Bank, against which the charge of usury had been waived and no longer existed, the validity of the note in suit must be held to rest upon the same firm foundation; and while, as we have held, there is no usury in this case, if there had been it is too late to raise it in the present suit.

It may be suggested that if usury had attached to the giving of the original two $3,000 notes, it has long since lost its legal significance in the maze of curtailments, new notes, and bona fide holders in due course, that were involved in these complex transactions, extending through almost a decade.

The judgment is affirmed, with costs.